IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| LINDA DICKERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-5063-CV-SW-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CLAIMS FOR BENEFITS**

In April 2007, Plaintiff filed an application for disability benefits under Title II. In August 2009, she filed an application for supplemental security income benefits under Title XVI. Both applications alleged Plaintiff became disabled on May 16, 1995.[1] Following a hearing, an ALJ determined Plaintiff was disabled effective July 2, 2002, but before that date she retained the residual functional capacity to work. Plaintiff appeals the unfavorable portions of this ruling. After reviewing the Record and the parties' arguments, the Court affirms the Commissioner's decision.

I. BACKGROUND

Plaintiff was born in May 1950; she completed high school and one year of college and has prior work experience as a line worker in a plastics factory. In August 1995 she established care with Dr. R.F. Williams upon moving to Missouri from Connecticut. She told Dr. Williams that she was "on intermittent medication and

---

[1]The ALJ's opinion indicates Plaintiff's alleged onset date is May 16, 1995. R. at 17, 19. This date is confirmed by some of the paperwork in the file. E.g., R. at 77. However, during the hearing, Plaintiff's attorney identified May 16, 1996, as the onset date. R. at 1106.

counseling for at least fifteen years, was doing well on a combination of Prozxac and Ativan, but had run out of Ativan. Dr. Williams provided a prescription for Ativan, arranged to obtain Plaintiff's records, and made an appointment for the following month. At that appointment Plaintiff indicated that she was "getting along fairly well" and had "[n]o specific complaints." R. at 146. In October Plaintiff reported experiencing headaches, which Dr. Williams indicated were "possibly vascular or stress." The following month Plaintiff's headaches were "not nearly as bad." R at 147. In December, Plaintiff was suffering from sinusitus, but "[o]therwise [was] doing well;" she was not depressed and was not experiencing significant headaches. However, in February 1996 she reported feeling depressed, but Dr. Williams attributed this to the stress of having two daughters and a granddaughter move into the house. Plaintiff indicated she was trying to see a psychiatrist. R. at 148.

That month Plaintiff was also evaluated by a nurse (Mary Parker) at the Ozark Center. Nurse Parker indicated Plaintiff suffered from depression, assessed her GAF score at 70, and recommended she continue medications. Nurse Parker also suggested Plaintiff should undergo a psychiatric evaluation and might benefit from outpatient, individual therapy. R. at 131-34. In April, Plaintiff saw Dr. Kent Worthen at the Ozark Center, chiefly complaining of seeing shapes moving in her peripheral vision. Dr. Worthen diagnosed Plaintiff as suffering from a dysthymic disorder and a panic disorder without agoraphobia. He recommended that Plaintiff undergo certain blood tests and continue receiving counseling from Nurse Parker. R. at 129-30. Plaintiff saw Nurse Parker approximately nine times between February and September 1996. Notes from these sessions reflect varying degrees of anxiety and sadness on Plaintiff's part, mostly attributed to her then-present family situation and dealing with abuse she suffered as a child. The notes do not reflect hallucinations or any serious consequences or limitations from Plaintiff's depression and anxiety. R. at 121-28.[2] In August, Plaintiff told Dr. Williams that "things have been going pretty well" and indicated

---

[2]Plaintiff was briefly hospitalized in May 1996 for what Dr. Williams described as a "stress reaction." Plaintiff's medications were adjusted and she was encouraged to exercise. R. at 149.

2

the counseling and medication were helping "quite a bit." R. at 149. In December, Plaintiff reported she opted to stop taking Prozac and was "taking some herbs instead." Plaintiff was "getting along pretty well." R. at 150. Positive reports continued through 1997.

In February 1998, Plaintiff went to the psychiatric office of Dr. Steven Kory, where she was seen by Nurse Nancy Price.[3] Plaintiff indicated she was less depressed and her "down days" were less frequent. Her "[m]ood is better and more stable. No crying spells" and she had "[n]o psychotic or delusional thinking." She reported seeing "scurrry[ing] things in her peripheral vision." Plaintiff was instructed to continue taking Remeron and Xanax. R. at 177-78. At her next visit in April, Plaintiff advised Dr. Kory that she had stopped taking the anti-depressant because she believed it caused her to gain weight, so he prescribed a different medication. R. at 176. Plaintiff later reported that the replacement medication worked "fine" and that her headaches were due to stress. R. at 179. Later that month, Plaintiff saw Dr. Williams and told him that medication was working well and that the stress-induced headaches were her biggest problem. In May, Plaintiff told Dr. Williams the headaches "finally cleared up" and he noted Plaintiff "seems to be coping with things better." R. at 153-54.

In late September, Plaintiff returned to Dr. Williams and reported that she had been "[g]etting along reasonably well up until the last three or four weeks." Plaintiff was experiencing a lot of stress due to her daughter's involvement in a car accident and other situational problems. R. at 155. In October, she went to a counseling session with Nurse Parker, who indicated Plaintiff suffered from major depression, panic disorder, and PTSD, and assessed Plaintiff's GAF score at 60. R. at 139.

In contrast, in January 1999 Plaintiff went to Dr. Kory's office[4] and saw Dr. Jayne Stillings and reported "overall feeling much better." Plaintiff had been experiencing

---

[3]The record from this visit suggests it was not her first to Dr. Kory's office, but there are no earlier records from his office.

[4]It appears that Dr. Kory and Dr. Stillings were at the psychiatric clinic at St. John's Regional Medical Center.

3

fewer mood swings and her medication was effective. Plaintiff made similar positive statements in February 1999. R. at 173.

In March 2000, a sleep study revealed that Plaintiff suffered from severe obstructive sleep apnea. A CPAP machine proved to provide normal respiration during sleep. R. at 256-60.

There are no other medical records regarding Plaintiff's condition before July 2, 2002.

During the hearing, Plaintiff described some of the traumatic events in her life and seemed to indicate she was unable to work after her hospitalization in May 1996. R. at 1106-07. According to her testimony, since that date she slept "a lot," was too frightened to go out in public, and was unsuccessful in her attempts to obtain effective mental health treatment. R. at 1107-08. Plaintiff reported having uncontrollable crying spells on a daily basis, and having problems sleeping. R. at 1109-10. She testified she could not have worked from 1996 to 2000 because she "couldn't think straight" and "the thought of going out and getting a job and working" was more than she could do. R. at 1109.

The ALJ found Plaintiff suffered from the following severe impairments: arthritic changes at her L5-S1 vertebrae and the continuing effects of a prior elbow surgery. The ALJ found Plaintiff's anxiety, depression, PTSD and dysthymia were non-severe because Plaintiff's medical records did not indicate any vocational limitations from these conditions. R. at 19-20.

## II. DISCUSSION

### A. Standards

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some

4

evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

One of the issues in this case involves the ALJ's assessment of Plaintiff's credibility. The familiar standard for analyzing a claimant's subjective complaints is set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted):

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
>    1. The claimant's daily activities;
>    2. the duration, frequency and intensity of the pain
>    3. precipitating and aggravating factors;
>    4. dosage, effectiveness and side effects of medication;
>    5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints solely on the basis of personal

5

> observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

739 F.2d at 1322.

### B. Finding of Non-Severity and Credibility Assessment

Plaintiff first contends the ALJ erred in concluding her mental impairments were not severe at step two of the five-step analysis. If an impairment has "no more than a minimal effect on the claimant's ability to work , then it does not satisfy the requirement of step two. . . . Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ." Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007). Plaintiff has ably demonstrated she suffered from mental impairments, but the Record does not demonstrate the ALJ erred in concluding they had no more than a minimal effect on her ability to work. Substantial evidence supports the ALJ's finding, most notably in the reports from Plaintiff's treating professionals. None of these reports indicated there was more than a minimal effect on Plaintiff's ability to work. Moreover, Plaintiff's testimony was contradicted by her statements to these professionals, both in terms of (1) statements that differed from her testimony and (2) her failure to report to those treating her the conditions she described in her testimony. The ALJ was entitled to conclude Plaintiff was more truthful when she was seeking treatment than when she was seeking benefits, and was also entitled to conclude that the Record as a whole demonstrated Plaintiff's mental impairments imposed a minimal effect on her ability to work.

### C. Inadequate RFC

Plaintiff next contends the ALJ failed to properly ascertain her residual functional capacity ("RFC") in light of her elbow surgery. However, Plaintiff has not identified for the Court any portion of the Record that would substantiate a more limiting RFC. The

Court is neither obligated nor inclined to search the Record to ascertain whether there is evidence supporting Plaintiff's contention.

### III. CONCLUSION

The Commissioner determined Plaintiff was disabled effective July 2, 2002, but before that date she retained the residual functional capacity to work. This final decision is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: March 21, 2012                UNITED STATES DISTRICT COURT